# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Waxing the City Franchisor LLC,

     Plaintiff and Counterclaim Defendant,

        v.

Eial Katularu, *also known as* Eyal Katz;
Alessandro Romaniello;
and Wild Honey Skin Co., LLC;

     Defendants and Counterclaimants.

Case No. 24-CV-02479 (JMB/DJF)

**ORDER**

R. Henry Pfutzenreuter and Sarah DeWitt Greening, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, MN, for Plaintiff and Counterclaim Defendant Waxing the City Franchisor LLC.

Scott E. Korzenowski, Serena I. Chiquoine, and Alejandra Martinez, Dady & Gardner, P.A., Minneapolis, MN, for Defendants and Counterclaimants Eial Katularu, Alessandro Romaniello, and Wild Honey Skin Co., LLC.

This matter is before the Court on Plaintiff Waxing the City Franchisor LLC's (WTC) motion for a preliminary injunction against Defendants Eial Katularu, a/k/a Eyal Katz,[1] and Wild Honey Skin Co., LLC (Wild Honey) for alleged violations of certain franchise agreements between Katz and WTC and for alleged trade secret misappropriation, which WTC asserts has caused it irreparable harm. (Doc. No. 7.) For the reasons discussed below, the Court grants WTC's motion.

---

[1] In his Declaration, Defendant Eial Katularu identifies himself as "Eyal Katz" and states that he was "formerly known as Eial Katularu." (Doc. No. 23 at 1.) For that reason, he will be referred to as "Katz" in this Order.

## BACKGROUND

### A.    WTC's Franchising Business

WTC owns and licenses a "system for operating personal care businesses" (System). The businesses offer body waxing services, as well as other products and services for skincare, eyelashes, and brows.  (Doc. No. 1-1 [hereinafter, "Compl."] ¶ 11.)[2]  WTC has franchised 150 waxing studios in thirty-four states.  (*Id.* ¶ 13.)  WTC currently has five franchised studios in the Phoenix metropolitan area, where the events giving rise to this action took place.  (Doc. No. 27 [hereinafter "Yiangou Decl."] ¶ 2.)

WTC helps its new franchisees set up their businesses.  (Compl. ¶ 20.)  For example, WTC assists with site selection, lease negotiations, studio design and construction, and in business operations.  (*Id.*)  Once in business, franchisees benefit from WTC's brand recognition, grand-opening marketing programs, and advertising assistance to build their local customer base.  (*Id.*)  Once open, franchisees continue to enjoy "credentialed access to [WTC's] confidential information and trade secrets," including an Operations Manual, which "describ[es] its proprietary methods, procedures, standards, and specifications about waxing techniques, marketing strategies, hiring and growth, technology, management, and business practices."  (*Id.* ¶ 21.)  They also have access to information about esthetician training materials and a client database (including "contact information, service and

---

[2] The Director of Franchise Administration & Compliance at Self Esteem Brands, LLC, Kimberly Feuchtmann, verified the factual allegations in the Complaint.  (Doc. No. 1-1 at 31.)  Self Esteem Brands, LLC is the parent company of, or "own[s]," WTC.  (*See* Doc. No. 8 at 16 n.3; Doc. No. 27 ¶ 1.)

product preferences, and appointment history and frequency"). (*Id.*) WTC has spent "substantial sums of money and other resources" to develop this confidential and proprietary information, and therefore keeps it on "secure password protected servers," and provides access only on a need-to-know basis. (*Id.* ¶¶ 21, 22.)

The products used in the WTC studios are "proprietary, custom-formulated waxes," and those sold in the studios are available for purchase only at WTC's studios. (*Id.* ¶ 18.) Additionally, the studios' licensed estheticians are required to complete a proprietary training course (by which they become a "Cerologist") before providing services, which includes training on both retail sales and use of the studios' products. (*Id.* ¶¶ 16, 18.) WTC provides ongoing continuing education materials to franchisees and Cerologists. (*Id.* ¶ 17.)

**B.    Romaniello's and Katz's Franchise Agreements with WTC**

Katz and Romaniello have both owned and operated WTC studios in the Phoenix metropolitan area since 2014. (*Id.* ¶¶ 12, 25; Doc. No. 23 [hereinafter, "Katz Decl."] ¶ 1.) Katz and Romaniello benefitted from WTC's brand goodwill while getting their businesses up and running and continued to do so after they opened for business. (Compl. ¶¶ 26–27.)

Romaniello executed a franchise agreement with WTC in August 2014 and opened a WTC franchise in Glendale, Arizona (Glendale Studio). (*Id.* ¶ 25, Ex. 4 [hereinafter "Agmt."].) Katz owns the commercial building out of which the Glendale Studio operated. (*Id.* ¶ 28; Katz Decl. ¶ 4.) Then, in October 2014, Katz himself entered into a franchise agreement with WTC and opened a WTC franchise in Phoenix, Arizona (Phoenix Studio).

(*See* Compl. Ex. 3; Katz Decl. ¶ 1.)  The Phoenix Studio is situated approximately thirteen miles to the southeast of the Glendale Studio.[3]

Then, in May 2016, Katz entered into two more franchise agreements and opened WTC franchises in Scottsdale, Arizona (Scottsdale Studio) and Chandler, Arizona (Chandler Studio).  (Compl. ¶ 25, Exs. 1, 2.)  The Scottsdale Studio is situated approximately twenty miles east of the Glendale Studio and approximately twelve miles northeast of the Phoenix Studio.  The Chandler Studio is closest to the Phoenix Studio, from which it is situated approximately seventeen miles to the southeast.

At some point, Katz became involved with and took over the operation of the Glendale Studio.  (*Id.* ¶ 28.)  According to Katz, "Romaniello gave me the keys to his Waxing the City business in 2019."  (Katz Decl. ¶ 5.)  According to Katz, WTC had knowledge of this arrangement and "permitted [him] to operate Mr. Romaniello's business

---

[3] The distances referenced in this Order are measured using addresses provided by the parties and Google Maps.  S*ee, e.g.*, *Dalton v. Simonson Station Stores, Inc.*, No. 17-CV-04427(SRN/LIB), 2019 WL 5579981, at *10 n.11 (D. Minn. Oct. 29, 2019) (taking judicial notice of distance using Google Maps); *see also Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of a map provided by Google Maps because its "accuracy cannot reasonably be questioned" (quoting Fed. R. Evid. 201(b))); *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007) (taking judicial notice of distance calculation that relied on information provided by Google Maps).

without an executed franchise agreement."[4]  (*Id.*)  Romaniello's current whereabouts are not known.[5]  (Compl. ¶ 6.)

The Agreements[6] have ten-year initial terms.  (Agmt. § 2(A).)  That being the case, the Glendale Studio's agreement was set to expire on August 12, 2024; the Phoenix Studio's agreement will expire in October 2024; and the Scottsdale Studio's and the Chandler Studio's agreements will expire in May 2026.  (*See* Compl. Exs. 1–4.)  Each franchise has an assigned "Protected Territory" (a "radius of 2.25 miles around the Franchised location") in which, during the term of an Agreement, WTC agrees not to license another franchise.  (Agmt. ¶ 1(C); Doc. No. 1-1 at 191.)  At the end of the Agreements' initial term, franchisees have the right to terminate or renew.  (Agmt. § 2(B).)

Through the Agreements, WTC grants the relevant franchisee a limited license to use the System and, in exchange for this limited license, the relevant franchisee pays certain fees to WTC.  (*Id.* § 5(A).)  Franchisees acknowledge the following with respect to WTC's confidential information:

> You acknowledge that all the information you have now or obtain in the future concerning the [franchise] System and the concepts and methods of promotion franchised hereunder is derived from us pursuant to this Agreement, and that you will treat such information in confidence.  You agree never to,

---

[4] WTC makes no argument that an implied contract arose between Katz and WTC related to his operation of the Glendale Studio.

[5] At the hearing on this motion, Romaniello's counsel informed the Court that Romaniello may be in Spain.

[6] Because the terms of the franchise agreements for the Glendale, Chandler, Phoenix, and Scottsdale Studios are "materially the same" (*id.* ¶ 29 n.1), they are referred to simply as the "Agreements."  (*See* Compl. Exs. 1–4.)

> directly or indirectly, engage in or abet the misappropriation (as the term "misappropriation" is defined in the Minnesota Uniform Trade Secrets Act), or the disclosure, divulgence, or distribution of all or any part of the System and the concepts and methods of promoting franchises hereunder.

( *Id.* § 10(A).)  They further agree that the following information—including "customer data"—belongs to WTC:

> All of the information we or our affiliates obtain from you or about your Waxing Studio, and all information in your records or ours concerning the customers of your Waxing Studio ("the Information") and all revenues we derive from the Information will be our property. . . . The Information . . . will become our property which we may use for any reason as we deem necessary or appropriate in our discretion. . . . Following termination or expiration of this Agreement, you will no longer use any of the Information, except to comply with your post-term obligations under this Agreement . . . .

(*Id.* § 9(O).)

The Agreements also include in-term and post-term non-compete provisions. During the term of an Agreement, franchisees are prohibited from working for, owning, managing, or otherwise being involved in the operation of another non-WTC waxing studio, regardless of its location, as follows:

> You will not, directly or indirectly, during the term of this Agreement, on your own account or as an employee, consultant, partner, officer, director, shareholder or member of any other person, firm, entity, partnership, corporation or company, own, operate, lease to or lease from, franchise, engage in, be connected with, have any interest in, or assist any person or entity engaged in owning, operating, or managing any business that offers hair removal services, wherever located, whether within the Protected Territory or elsewhere.

( *Id.* § 17(A).)

After expiration or termination of an Agreement, the post-term non-compete prohibits franchisees from working for, owning, or managing another waxing studio within ten miles of any other WTC franchise for a period of two years, as follows:

> You will not, directly or indirectly, for a period of two (2) years after the transfer by you, or the expiration or termination of this Agreement, on your own account or as an employee, consultant, partner, officer, director, shareholder, lender, or joint venturer of any other person, firm, entity, partnership, corporation or company, own, operate, lease to or lease from, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in offering hair removal services, which is located within the Protected Territory or within a ten (10) mile radius of any Waxing the City studio, wherever located, whether within the Protected Territory or elsewhere.

(*Id.* § 17(B).)   Franchisees expressly agree that the restrictions in these non-compete provisions are both "reasonable and necessary" to protect WTC's legitimate business interests.  (*Id.* § 17(C).)

### C.    Conversion of the Glendale Studio into Competing Hair Removal Studio

In early 2024, WTC attempted to contact Katz about either renewing the Glendale Studio's franchise agreement set to expire in August or purchasing the Glendale Studio; Katz did not respond with interest.  (Compl. ¶ 40; Yiangou Decl. ¶ 3.)  Since May, WTC has been unable to reach Katz.  (Compl. ¶ 40.)

Then, in early June 2024, WTC learned that Katz had opened a new waxing business, Wild Honey, in the same location out of which the Glendale Studio had operated. (Compl. ¶ 41; Katz Decl. ¶ 7.)  Katz had begun advertising about Wild Honey's impending opening and services on social media as early as May 20, 2024.  (Compl. Ex. 5.)  Around

that same time, WTC stopped receiving payments due under the Glendale Studio's franchise agreement.  (Compl. ¶ 47.)

According to Katz, Wild Honey provides the same services as WTC; it "offers full body waxing, laser hair removal, and facials."  (Katz Decl. ¶ 7.)  Katz states that he has "not used any of Waxing the City's confidential or proprietary information in the development and operation of Wild Honey."  (*Id.*)  He also represents that Wild Honey "operates under a different trademark and business model" than WTC and uses different products in its services.  (*Id.* ¶ 8.)

Wild Honey appears to have targeted and continues to serve the Glendale Studio's client base.  For example, on Wild Honey's pre-opening Facebook post, it thanked "our wonderful clients & amazing staff for your patience during our build-out," and stated that it "c[ould]n't wait to show you what we've been up to at Wild Honey!"[7]  (Compl. Ex. 5 at 21.)  Wild Honey also employs the same estheticians who had worked at the Glendale Studio.  (Compl. ¶ 44, Ex. 8; *see also* Doc. No. 21 at 11 (conceding "Wild Honey maintains the same employees [as the Glendale Studio]").)

WTC has continued its efforts, without success, to find franchisees that are interested in opening a studio in the same territory as the Glendale Studio.  (Yiangou Decl. ¶ 3.)  According to WTC, the existence of Wild Honey is "a material obstacle to Waxing the City's ability to re-franchise its territories."  (*Id.*)

---

[7] At the hearing on this motion, Katz's and Wild Honey's counsel informed the Court that Wild Honey did not and does not have any other stores other than the one operating in Glendale.

**D.     This Action**

On June 20, 2024, WTC filed its Complaint and motion for preliminary injunction in Ramsey County District Court.  (Compl. 1-1.)  In its nine-count Complaint, WTC asserts breach-of-contract, tortious-interference-with-contract, unfair competition, civil conspiracy, and unjust enrichment claims against the Defendants.  (*Id.*)  In Count VIII, WTC also seeks injunctive relief.  (*Id.* ¶¶ 99–102.)  Defendants removed the action to this Court days later.

On July 3, WTC filed its motion for a Preliminary Injunction in this Court.  (Doc. No. 7.)  In it, WTC seeks an order enjoining Katz and Wild Honey[8] from the following conduct:  (1) misappropriating WTC's confidential information—specifically, its client information, Operations Manual, and training materials (Doc. No. 11 at 2 ("[M]isappropriating, disclosing, divulging, transferring, or distributing to others Waxing the City's Confidential Information . . . .")); and (2) operating Wild Honey or any other competing waxing and skincare business.  (*Id.* at 2–3 ("[O]wn[ing], operat[ing], leas[ing] to or leas[ing] from, franchis[ing], engag[ing] in, . . . any business that offers hair removal services, wherever located, including "Wild Honey Skin Co., . . . but not including Mr. K[atz]'s ownership and operation of the Waxing the City® studios licensed to him by Waxing the City in Scottsdale, Chandler, and Phoenix, Arizona," and "any direct or indirect involvement, connection, ownership of, engagement, or having any interest in or assisting

---

[8] WTC does not seek any injunctive relief relating to its allegations against Romaniello. (*See* Doc. No. 8 at 2 n.1.)

Wild Honey Skin.").)  WTC also seeks an award of attorneys' fees for the cost of bringing its motion for injunctive relief.[9]  (*Id.* at 3.)

## DISCUSSION

## I.    PRELIMINARY INJUNCITON

When considering whether to grant a motion for preliminary injunction, the Court considers four factors: (A) the probability that movant will succeed on the merits; (B) the threat of irreparable harm to the movant; (C) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; and (D) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  No one factor is determinative, and the Court "should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quotation omitted).  The burden of establishing every factor belongs to the movant.  *E.g.*, *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### A.    Likelihood of Success on the Merits

The first *Dataphase* factor requires the Court to consider how likely it is that WTC will prevail on the merits of its claims.  *Dataphase*, 640 F.2d at 114.  This factor is regarded as the "most significant" to the Court's ultimate determination whether to grant a motion

---

[9] The Agreements provide for an award of attorneys' fees to WTC if WTC brings a successful injunctive action.  (Agmt. § 18(A).)

for injunctive relief. *CPI Card Grp. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018). At this stage, the inquiry is not whether WTC will ultimately win. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991); *Dataphase*, 640 F.3d at 113 (providing that likelihood-of-success factor does not require plaintiff to demonstrate a "greater than fifty per cent likelihood that he will prevail on the merits").

WTC asserts that it will likely prevail on the following claims, which establish its right to injunctive relief: (1) its breach-of-contract claim against Katz for his alleged breach of the in-term non-compete provisions in the Chandler, Phoenix, and Scottsdale Agreements; (2) its trade-secret misappropriation claim; and (3) its breach-of-contract claim against Katz for alleged violations of the Agreements' confidentiality provisions. (Doc. No. 8 at 16–24.)

### 1.    Breach of Contract—In-Term Non-Compete

WTC argues that it will likely succeed on its claim that Katz's operation of Wild Honey violates the in-term non-compete provisions in the Chandler, Phoenix, and Scottsdale Agreements. (Agmt. § 17(A); *see also* Doc. No. 8 at 16–21; Compl. Exs. 1, 2, 3.) Those in-term non-compete provisions provide that, so long as Katz is a franchisee of WTC (i.e., until May 2026), he cannot operate or be involved in the operation of "any business that offers hair removal services," regardless of its location. (Compl. Ex. 1 § 17(A), Ex. 2 § 17(A), Ex. 3 § 17(A).) Katz has plainly offended these terms. He operates Wild Honey, which primarily offers waxing and laser hair removal services. (Katz Decl. ¶ 7; Compl. Ex. 10.)

Nevertheless, Katz argues that WTC is unlikely to prevail for two reasons. First, Katz asserts that WTC has not shown that it wishes to place a WTC in Glendale or that the operation of Wild Honey is an impediment to WTC doing so. Second, Katz argues that absent a geographical restriction, the in-term non-compete provision is overly broad and, therefore, unenforceable. Neither argument has merit.

Non-competes in franchise agreements, including in-term non-competes, are generally enforceable if they serve "a just and honest purpose," and are "for the protection of a legitimate interest of the party in whose favor it is imposed, reasonable as between the parties, and not injurious to the public." *In re EllDan Corp.*, No. 22-31870, 2023 WL 3394917, at *3 (Bankr. D. Minn. May 11, 2023); *see also Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 899–900 (Minn. 1965) (providing non-competes are enforceable only to the extent necessary to protect a legitimate business interest). A franchisor's ability to re-franchise is a protectable interest. *See Anytime Fitness, Inc. v. Reserve Holdings, LLC*, No. 08-CV-4905 (MJD/JJK), 2008 WL 5191853, at *4 (D. Minn. Oct. 8, 2008) (concluding post-term non-compete reasonable and enforceable to protect business interests such as good will and ability to re-franchise in area); *In re EllDan Corp.*, 2023 WL 3394917, at *3 (observing that, "[u]nder Minnesota law, a franchisor has a just and honest purpose and a legitimate interest in protecting itself from the competition of a former franchisee operating in the same market," in protecting its confidential information and proprietary information, and in re-franchising to protect their existing investment in its good will in the area).

Contrary to Katz's characterization of the record, WTC has presented evidence that Wild Honey is impeding its ongoing efforts to re-franchise the territory served by the

Glendale Studio.  Jennifer Yiangou, the Senior Vice President of Franchise Administration for Self-Esteem Brands, LLC,[10] stated in her sworn declaration that WTC continues its efforts to re-franchise the territory around the former Glendale Studio, and that "[t]he existence of competitive businesses, particularly any operated by a current or former franchisee, are a material obstacle to Waxing the City's ability to re-franchise its territories." (Yiangou Decl. ¶ 3.)  WTC has thus presented the requisite evidence to show that the in-term non-compete is necessary to protect a legitimate business interest.

The Court also disagrees with Katz's second argument: that the in-term non-compete is likely unenforceable because it lacks a geographic restriction.[11]  Courts have discretion to "blue pencil" an otherwise overly broad geographic scope of a non-compete clause in order to render it enforceable.[12]  *Witzke v. Mesabi Rehab. Servs., Inc.*, 768 N.W.2d 127, 129 n.1 (Minn. App. 2009); *see also Bess v. Bothman*, 257 N.W.2d 791, 794 (Minn.

---

[10] *See supra* footnote 2.

[11] As a threshold matter, contrary to Katz's argument, the Court's likelihood-of-success inquiry does not turn on the likelihood of Wild Honey's clients to forego services at Wild Honey and opt for services at WTC locations.  Instead, the relevant inquiry is whether WTC has a legitimate business interest in cultivating the customers of the Glendale Studio, as well as potential customers in the market served by Wild Honey.

[12] WTC argues that the unlimited geographic scope of the in-term non-compete is reasonable, citing *Anytime Fitness, LLC v. Panda Holdings, LLC*, No. 62-CV-18-1479 (Minn. Dist. Ct. Mar. 16, 2018) (Ramsey Cnty., Gilligan, J.) (Doc. No. 1-2 at 9 ¶ 3) (enforcing in-term non-compete in franchise agreement against franchisee and enjoining franchisee from operating competing fitness facility "wherever located") and *Anytime Fitness, LLC v. Evans*, No. 62-CV-18-3325 (Minn. Dist. Ct. May 10, 2018) (Doc No. 1-2 at 36 ¶ 4) (Ramsey Cnty., Castro, J.) (same).  While a court could ultimately agree with the analysis in those cases, a court could alternatively blue pencil the in-term non-compete to include some geographic restriction.  WTC could prevail under either approach.

1977) (adopting blue-pencil doctrine as applied to non-competes to the extent "a court is merely enforcing the legal parts of a divisible contract rather than making a new contract for the parties"); *C.H. Robinson Worldwide Inc. v. Kratt*, No. 27-CV-12-16003, 2013 WL 6222078, at *15 (Minn. Dist. Ct. Jan. 17, 2013) (Hennepin Cnty.) (invoking blue-pencil doctrine "for purposes of fashioning injunctive relief" but "only to the extent reasonably necessary to protect Plaintiff's legitimate business interests").

Given the legitimate business interests implicated in the in-term non-compete (i.e., prohibiting a franchisee from using knowledge obtained through the franchise relationship to directly compete with the franchise), a court is likely to the limit the geographic scope of the in-term non-compete clause at issue.  Specifically, a court is likely to blue pencil the non-compete so it is limited to the market that WTC is actively targeting.  Here, both parties refer to and acknowledge the "Phoenix metropolitan area" as the relevant market that WTC is targeting.  (*See* Doc. No. 21 at 12; Doc. No. 27 ¶ 3.)  A geographic restriction limiting the non-compete to this metropolitan area would be reasonable under Minnesota law.  *See Anytime Fitness, Inc. v. Family Fitness of Royal, LLC*, No. 09-CV-3503 (DSD/JSM), 2010 WL 145259 (D. Minn. Jan. 8, 2010) (concluding county-wide restriction on franchisee's in-term competition was reasonable to protect franchisor's legitimate business interests); *Adcom Express, Inc. v. EPK, Inc.*, No. C6-95-2128, 1996 WL 266412, at *1, 4 (Minn. App. May 21, 1996) (concluding in-term non-compete prohibiting competing business within 50-mile radius of franchise location was reasonable).

Such a restriction would cover Glendale and would therefore prohibit Katz from converting the Glendale Studio into a Wild Honey studio and from operating the converted

WTC franchise as a competitor out of the same location.  WTC has shown that it likely would succeed on the merits of its breach-of-contract claim related to Katz's alleged violation of the in-term non-compete provisions in the Chandler, Phoenix, and Scottsdale Agreements.

### 2.    *Trade Secret Misappropriation*

WTC argues that it is likely to prevail on its trade-secret misappropriation claims and identifies the following three categories of trade secrets that it asserts Katz and Wild Honey have misappropriated in violation of the Minnesota Uniform Trade Secrets Act (MUTSA), Minn. Stat. ch. 325C.01, and the Defend Trade Secrets Act (DTSA), 18 U.S.C. tit. 18, pt. 1, ch. 90. (Count III): (1) WTC's Cerology training information; (2) the Operations Manual; and (3) "client data, which includes their contact information, service and product preference, and appointment history and frequency." (Doc. No. 8 at 23.)  The Court agrees that WTC is likely to succeed on the merits of at least the customer data portion of its trade-secret misappropriation claims.

Under the MUTSA and DTSA, a "trade secret" is "information" that "(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018) (quotation omitted). Under both statutes, "misappropriation" occurs when a trade secret is disclosed "without express or implied consent" by a person who "derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."  Minn. Stat. § 325C.01, subd. 3(ii)(B)(III); 18 U.S.C. § 1839(5)(B)(ii)(III).   A court may enjoin

"[a]ctual or threatened misappropriation."    Minn. Stat. § 325C.02(a); 18 U.S.C. § 1836(b)(3)(A)(i).  Such an injunction "shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."  Minn. Stat. § 325C.02(a).

The Court cannot conclude, on the record before it, that Katz is relying on the Cerology training information or the contents of the Operations Manual in the operation of Wild Honey.  Although Wild Honey's staff comprises the Glendale Studio's former estheticians, this alone is not proof that Katz has misappropriated the Cerology training materials.  After all, the Court has no evidence to show that the Glendale Studio's estheticians did not have relevant hair-removal training and experience before encountering Cerology training.  As for the Operations Manual, the Court has not been provided with the manual and WTC has not identified specific provisions from the manual that could be at issue here.  For his part, Katz stated in a sworn declaration that Wild Honey "operates under a different trademark and business model from Waxing the City."  (Katz Decl. ¶ 8.)  WTC is not likely to succeed, without additional evidence, on its claims that Katz misappropriated trade-secrets through use of Cerology training materials or the Operations Manual.

However, the Court reaches a different conclusion when evaluating the likelihood that WTC could succeed on its claim that Katz and Wild Honey misappropriated client data.  Customer information that is protected and not readily ascertainable can constitute a trade secret.  *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 90 (Minn.

1979) (holding that customer lists can constitute trade secrets); *but see Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 868 (D. Minn. 2015) (concluding customer list was not *per se* trade secret where identity of customers could be readily ascertained in industry); *NewLeaf Designs, LLC v. BestBins Corp.*, 168 F. Supp. 2d 1039, 1043–44 (D. Minn. 2001) (concluding customer lists that included detailed information about customers was not *per se* a trade secret, because defendants presented evidence that the information at issue about customers was industry knowledge).

Here, WTC represents that its "client database," which includes information such as "contact information, service and product preferences, and appointment history and frequency," was made available to Katz on a need-to-know basis and via password-protected access. (Compl. ¶¶ 21–22.) Further, the Agreements clearly identify client information as belonging to WTC, not to the franchisee or its operators. (*See* Agmt. § 9(O).) Wild Honey and Katz do not deny that Wild Honey's clients are the same as the Glendale Studio's clients. Counsel conceded as much as oral argument. In addition, WTC has submitted evidence showing that Wild Honey has relied on and targeted the Glendale Studio's customer base—in its pre-opening social media posts, Wild Honey thanked "our wonderful clients." (*See* Compl. Ex. 5 at 8, 21.) At the time, Wild Honey had not yet opened, so it should have had no existing clients. Thus, the Court concludes that WTC will likely prevail on a MUTSA and DTSA claim based on allegations that Katz and Wild Honey misappropriated WTC's customer information.

### 3.     *Breach of Contract—Confidentiality*

WTC argues that it is likely to prevail on its breach-of-contract claim relating to its allegations that Katz violated the Agreements' prohibition on the misuse of WTC's confidential information in section 10(A)—namely, the Cerology training materials, Operations Manual, and customer lists.  (Doc. No. 8 at 21–22.)  Section 10(A) of the Agreements provide that "all the information you have now or obtain in the future concerning the [franchise] System . . . is derived from us . . . , and that you will treat such information in confidence."

As noted above, *supra* Part A.i., WTC has not shown that Katz has failed to keep the confidence of the Operations Manual or Cerology training materials.  Regarding client information, the Court is careful to distinguish the contracts to which Katz was a party (those concerning the Scottsdale, Chandler, and Phoenix Studios) from the contract to which Katz was not a party (the agreement concerning the Glendale Studio).[13]  Importantly, WTC does not argue that Katz obtained any alleged Confidential Information relating to the Glendale Studio (e.g., customer lists) through the credentialed access Katz enjoyed as part of his operation of the Chandler, Phoenix, or Scottsdale Studios.  The Agreement concerning the Glendale Studio has several no-transfer and no-assignment provisions.  (Agmt. § 1(A), 1(B), 13(B).)  Further, WTC does not argue—or even suggest—that it ever entered into any franchise agreement or confidentiality agreement, whether express or

---

[13] WTC does not specify under which Agreement or Agreements this claim arises.  The Court observes that the relevant Agreement governing the Glendale Studio was expressly between Romaniello and WTC.  (*See* Doc. No. 1-1 at 157, 188, 190, 192.)

implied, with Katz regarding his operation or management of the Glendale Studio after Romaniello seemingly abandoned it.  For these reasons, the Court concludes that WTC is not likely to succeed on its claim that Katz breached section 10A of the Agreements relating to the Scottsdale, Chandler, or Phoenix Studios.

**B.     Irreparable Harm**

WTC argues that the conversion of the Glendale Studio into a competing hair removal studio causes irreparable harm because it removes the existing WTC franchise and also "thwart[s]" WTC's "efforts to refranchise" in the area because "no prospective franchisee would ever want to start a business in competition with one that already realized" the benefits of WTC's franchising system for years.  (Compl. ¶ 49.)  WTC further asserts that Katz and Wild Honey will "attempt to unfairly corner the entire Phoenix metropolitan market area for themselves, which [WTC] has developed over the past decade."  (*Id.* ¶ 48.)  Katz and Wild Honey argue that WTC fails to establish this factor because its assertions are "generalized statements, speculation and broad assertions" (Doc. No. 21 at 9.)

Irreparable harm can be harm that is either "actual or threatened."  *St. Jude Med., Inc. v. Carter*, 913 N.W.2d 678, 684 (Minn. 2018).  To carry its burden on this factor, WTC must show that "irreparable injury has resulted, or will in all probability result," and that "[t]he threatened injury [is] real and substantial" as a result of Katz's breach of the in-term non-competes in the Chandler, Phoenix, and Scottsdale Agreements and misappropriation of the Glendale Studio's client information.  *Id.*  More specifically, in the franchise context, "[p]otential loss of goodwill qualifies as irreparable harm" to the franchisor.  *Life Time*

*Fitness, Inc. v. DeCelles*, No. 12-CV-420 (DSD/SER), 854 F. Supp. 2d 690, 695 (D. Minn. 2012); *Anytime Fitness, LLC v. Edinburgh Fitness LLC*, No. 14-CV-348 (DWF/JJG), 2014 WL 1415081, at *7 (D. Minn. Apr. 11, 2014) (concluding that evidence showing franchisor invested resources and provided goodwill to franchisor, and that franchisee's use of them to operate competing business was irreparable harm).  Minnesota courts also acknowledge that "[i]t is difficult to attract a new franchisee when a former franchisee is improperly competing within the same area."  *Novus Franchising, Inc. v. Livengood*, No. 11-CV-1651 (MJD/TNL), 2012 WL 38580, at *5 (D. Minn. Jan. 9, 2012); *Reserve Holdings*, 2008 WL 5191853, at *6 ("If the preliminary injunction is not granted to enforce [plaintiff]'s covenant not to compete, its good will will be harmed by a competing business operating at the former [franchisee] location, impairing [its] ability to establish another franchise in that area.").  The Court in *Reserve Holdings* characterized such harm as a threat to the entire franchise system, as follows:

> Without the preliminary injunction, [franchisor] will be unable to attract new franchisees to [the area] and its current franchisees may think that they can violate their franchise agreements with impunity after having taken advantage of [franchisor's] good will to build their businesses, potentially causing [franchisor's] entire franchise system [to] unravel.

2008 WL 5191853, at *6; *see also Edinburgh Fitness*, 2014 WL 1415081, at *7 ("If the non-compete covenant is not enforced, . . . franchisees may think they can take advantage of [the franchisor's] knowledge, information, training, and goodwill to build a business, and then leave the system and start their own identical business to avoid paying fees.").

Here, the harm to WTC and its business interests is clear: its franchise in Glendale is now its competitor. Moreover, Katz has three other active WTC franchises around the Phoenix metropolitan area, one of which is set to expire in October 2024, and WTC would experience additional harm should Katz also attempt to convert these three franchises into competing waxing businesses. Thus, as it relates to the breach of the in-term non-compete claim, WTC has shown that it will be irreparably harmed if Wild Honey continues to operate. Further, Katz's continued reliance on WTC's client data from the Glendale Studio in its operation of Wild Honey will irreparably harm WTC's ability to refranchise in the relevant market.

### C.    Balance of Harms

WTC argues that the balance of harms favors an injunction because it has lost the ability to refranchise in the market, good will, and clients, and, in contrast, any harm suffered by Katz and Wild Honey "will be minor and self-inflicted." (Doc. No. 8 at 30–31.) Katz and Wild Honey argue that the damage WTC alleges is "speculative at best and serves solely as a penalty" to them and that, in Minnesota, self-inflicted harm is not a valid counterweight in this balancing analysis. (Doc. No. 21 at 13–14.) They further assert that an injunction would "be especially inequitable" because it would "prevent them from operating a profitable business with more than a dozen employees." (*Id.* at 14.)

This factor tips in favor of WTC. The harm of denying the preliminary injunction outweighs the harm to the party opposed to the injunction in cases where the opposing party's actions are at the root of the identified harms:

> The Court concludes that the balance of the harms weighs in favor of granting a preliminary injunction. As outlined above, [plaintiff] faces irreparable harm in the form of loss of goodwill, loss of customers, loss of proprietary information, and damage to the integrity and functioning of its franchise system as a whole. On the other hand, Defendants signed an Agreement and cannot now opt out of it. Any harm suffered is of their own making.

*Edinburgh Fitness*, 2014 WL 1415081, at *8; *see also Sierra Club v. U.S. Army Corp. of Eng'rs.*, 645 F.3d 978, 997 (8th Cir. 2011) (finding defendant's harm to be "self-inflicted" where it chose to proceed with $800 million construction project despite warnings that doing so would be at its own risk).

In this case, Katz is a party to three Agreements that explicitly and plainly prohibit him from operating Wild Honey and using the Glendale Studio's client information. If Katz wished to continue owning and operating a waxing studio in the Glendale Studio's former location, he could have taken steps to renew the franchise agreement for the Glendale Studio. Instead, he converted it to a competing hair removal studio. Even though neither party has attempted to quantify the identified harms, because Katz's conduct clearly violates at least three agreements, and given the nature of the harm resulting from denying the requested relief, this factor favors WTC.

### D.   Public Interest

The last factor also tips in favor of WTC. In *Edinburgh Fitness*, the Court grappled with this factor on a motion for preliminary injunction in a case involving an alleged breach of a franchise agreement that had a similar non-compete provision:

> The Court concludes that it is in the public interest to ensure that parties to franchise arrangements can contract on issues

such as non-competition and then expect each other to abide by agreed upon terms. It is further in the public interest to ensure that individuals cannot take and misuse proprietary information and goodwill through a franchising system to their own financial benefit. Though there is a public interest in free competition, the other benefits to the public weigh in favor of a preliminary injunction in this matter.

2014 WL 1415081, at *8. The Court finds this analysis fair and persuasive in view of the facts and circumstances of this case.[14] For the same reasons as in *Edinburgh Fitness*, the Court concludes that the public interest is served by ensuring that individuals cannot misuse a franchisor's information and goodwill for their own benefit, especially when doing so violates the clear terms of agreements to which the individual is a party.

## II.   BOND

The Court may issue a preliminary injunction "only if" the moving party "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has broad discretion to set bond but will abuse that discretion only if it acts with improper purpose, does not set adequate bond, or does not make necessary findings to support the amount of bond set. *See Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). The party seeking bond is required to establish a rational basis for the amount of the proposed bond. *In re President Casinos, Inc.*, 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007).

---

[14] The Court does acknowledge a rising tide of public policy measures that disfavor non-competes; however, those policy measures mostly implicate non-competes in employer-employee relationships and not in franchisor-franchisee relationships. Minnesota franchise law does not ban restrictive covenants related to in-term competitive activity or client solicitation. *See* Minn. Stat. § 181.991.

Here, WTC asserts that if bond is required, "it should be nominal" due to the unlikelihood the Court wrongfully restrains Defendants. (Doc. No. 8 at 33.) WTC believes $1,000 is an acceptable amount. (*Id.*) In their briefing, Katz and Wild Honey took no position on the appropriate amount of bond. (*See* Doc. No. 14.) At most, in his Declaration, Katz states that he will "suffer significant losses and financial hardship if [he] [is] forced to close Wild Honey Skin." (Doc. No. 23 ¶ 9.) At the hearing, Katz's and Wild Honey's counsel addressed this issue in passing, noting that it sought bond in an amount that was "significantly greater" than $1,000, but counsel did not provide the Court with a dollar amount or a detailed argument to support this position.

Because Katz has not provided the Court with any rational basis to determine an appropriate amount of bond, and because of the strength of WTC's case on the merits, the Court will set bond at WTC's suggested amount of $1,000. *See Powerlift Door Consultants, Inc. v. Shepard*, No. 21-CV-1316 (WMW/ECW), 2021 WL 2911177, at *8 (D. Minn. July 12, 2021) (declining to set bond in order granting injunctive relief where non-moving party sought a "substantial" bond but did not request a specific amount or provide a rational basis for such relief); *Bixby v. Lifespace Communities, Inc.*, No. 18-CV-817 (JRT/KMM), 2018 WL 3218697, at *7 (D. Minn. July 2, 2018) (concluding bond not necessary in order granting injunctive relief where moving party "demonstrated a high likelihood of success on the merits"). *But see Reserve Holdings*, 2008 WL 5191853, at *7 (setting bond at $25,000 "[b]ased on [the Court's] review of the record" and absent any argument from either party on the issue of appropriate bond).

24

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.   Plaintiff Waxing the City Franchisor LLC's Motion for a Preliminary Injunction (Doc. No. 7) is GRANTED as follows:

   a.   Katz is enjoined from, during the pendency of this lawsuit or until further order of the Court, directly or indirectly, on his own account or as an employee, consultant, partner, officer, director, shareholder or member of any other person, firm, entity, partnership, corporation or company, owning, operating, leasing to or leasing from, franchising, engaging in, being connected with, having any interest in, or assisting any person or entity engaged in owning, operating, or managing any business that offers hair removal services in the Phoenix metropolitan area, including Wild Honey Skin Co., located at 18185 North 83rd Ave., Suite C111, Glendale, AZ 85308, but not including Katz's ownership and operation of the Waxing the City studios licensed to him by Waxing the City in Chandler, Phoenix, and Scottsdale, Arizona, pursuant to section 17(A) of the relevant franchise agreements, as modified in this Order.

   b.   Katz is enjoined from any direct or indirect involvement, connection, ownership of, engagement, or having any interest in Wild Honey Skin Co., LLC.

   c.   Katz and Wild Honey are enjoined from misappropriating WTC's client data, as defined in the Minnesota Uniform Trade Secrets Act (MUTSA), Minn. Stat. ch. 325C.01, and the Defend Trade Secrets Act (DTSA), 18 U.S.C. tit. 18, pt. 1, ch. 90.

   d.   Katz and Wild Honey shall provide proof to WTC's counsel of all steps taken pursuant to this Order, within seven days of the date of this Order.

2.   WTC is hereby awarded its reasonable attorney fees and costs incurred in bringing this motion pursuant to section 18.A of the Agreements and Katz's Personal Guaranties.  (Doc. 1-1 at 70, 112, 151.)  WTC shall submit an itemization of its attorney fees and costs to this Court by affidavit no later than fourteen days from the date of this Order for a final determination on the amount owed.

3.      Pursuant to Federal Rule of Civil Procedure 65, WTC shall post cash or bond in the amount of $1,000 within seven days of this Order.


Dated: August 20, 2024                                 /s/ *Jeffrey M. Bryan*
                                                       Judge Jeffrey M. Bryan
                                                       United States District Court